UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| KEY EQUIPMENT FINANCE, a subdivision of KeyBank National Association, an Ohio Corporation, assignee of ORACLE CREDIT CORPORATION,<br><br>Plaintiff,<br>v.<br><br>BARRETT BUSINESS SERVICES, INC., a Washington Corporation,<br><br>Defendant. | CASE NO. 3:19-cv-05122-RBL<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS*<br><br>DKT. #9 |

**INTRODUCTION**

THIS MATTER is before the Court on Defendant Barrett Business Services, Inc.'s Motion to Dismiss or Stay for *Forum Non Conveniens*.[1] Dkt. #9. This dispute concerns Barrett's alleged failure to make payments under an agreement establishing a payment plan for a suite of cloud services designed to assist with administrative functions. Although Barrett entered the payment plan agreement with Oracle Credit Corporation ("OCC"), which assigned its interest to Plaintiff Key Equipment Finance ("Key), the cloud services themselves were obtained from

---

[1] Although the title of the Motion mentions a stay, Barrett's arguments seem to seek only dismissal.

Oracle America, Inc., ("Oracle") pursuant to another agreement. Barrett claims that both of these agreements are part of a single transaction and seeks to enforce the forum selection clause in the contract with Oracle against Key. Key, in opposition, contends that the forum selection clause cannot be enforced because it is part of a separate contract to which Key and its predecessor were never parties.

For the following reasons, the Court GRANTS Barrett's Motion to Dismiss for *Forum Non Conveniens*.

## BACKGROUND

Barrett, a Maryland company headquartered in Vancouver, WA, is in the business of establishing co-employment relationships between small and medium-sized companies and assuming responsibility for their administrative functions, such as payroll. Barrett's payroll and invoicing needs are therefore quite complicated. To address these needs, Barrett sought to make use of Oracle's human capital management (HCM) cloud system. Barrett states that it explained how complex and atypical its business structure and requirements are and Oracle assured Barrett that its services would be customized to meet Barrett's needs. Oracle's implementation partner, KBACE Technologies, Inc., apparently made similar assurances and provided Barrett with an estimate of how much the system would cost to implement. KBACE was later acquired by Cognizant Worldwide Limited and Cognizant Technology Solutions Corporation.

On February 28, 2018, Barrett contracted with Oracle for a suite of cloud services and with KBACE for implementation. The resulting Cloud Services Agreement ("CSA") between Barrett and Oracle contains the following forum selection clause: ". . . each party agrees to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California in any dispute arising out of or relating to this Agreement." Dkt. #1-1 at 7.

An additional Ordering Document ("Order") was executed the same day and included a list of prices for the services Barrett had contracted for, which totaled $15,128,787.20. Dkt. #1-2 at 3. The Order also contained a section entitled "Oracle Financing" that stated: "Oracle agrees that if, concurrent with the delivery of this Ordering Document, you deliver Oracle Financing Contract #92667 . . . that is satisfactory to Oracle Financing, then payment terms in [Contract #92667] shall replace the payment terms of this Ordering Document to the extent specified in [Contract #92667]." *Id*. at 8. Both the CSA and the Order state that payment is due within 30 days of the invoice date. Dkt. #1-1 at 2; Dkt. #1-2 at 5.

Barrett did indeed execute Contract #92667, or the Payment Plan Agreement ("PPA"), on February 28. The PPA describes itself as an agreement "entered into by Customer and Oracle Credit Corporation ("OCC") for payment of Customer's acquisition of the System," which is "acquired from Oracle Corporation." Dkt. #1-2 at 2. The PPA strains to emphasize that it is an "independent" contract creating an obligation to pay that "shall not be subject to any set-off, recoupment, claim or defense for any reason, including . . . any claim(s) against the Supplier," a.k.a. Oracle. Dkt. #1-2. The PPA also incorporates a separate Payment Schedule ("Schedule"), which divides Barrett's obligations into 19 separate payments due between May 1, 2018, and December 1, 2022. Dkt. #1-3. These payments add up to the same amount due under the Order: $15,128,787.20. *Id*. The Schedule states that it "replaces [Barrett's] payment obligations when due under the Order to Supplier to the extent of the System Price listed above and Customer agrees to pay the System Price on an installment basis." *Id*.

On April 20, 2018, OCC assigned its rights under the PPA and Schedule to Key Equipment Finance. Dkt. #1-4. The letter of assignment is on Oracle letterhead and states that

"Assignee assumes none of Supplier's obligations under the Order." *Id*. It also provides that all payments should be remitted to OCC's corporate trust. *Id*.

Several months after executing these agreements, Barrett became dissatisfied with the HCM system promised by Oracle. KBACE also informed Barrett that implementing the system would cost millions more than originally estimated. Meanwhile, Barrett began missing its payments under the Schedule, resulting in a warning letter from Key on October 6, 2018. Dkt. #1-5. Key followed this up with another letter in November informing Barrett that it was in default, accelerating the remaining payments. Dkt. #1-6.

On January 2, 2019, Barrett sued Oracle and the Cognizant entities in the Superior Court of San Francisco County.[2] Dkt. #9, Ex. A. The complaint alleges causes of action for negligent misrepresentation, breach of contract, and rescission of the contracts with Oracle and the Cognizant entities. *Id*. at 13-19. Key then filed this lawsuit against Barrett on February 14, 2019, to enforce the payment obligations in the PPA and Schedule. Dkt. #1.

## DISCUSSION

**1. Legal Standard**

The doctrine of *forum non conveniens* allows a court to dismiss a case outright when a foreign or state forum would be substantially more convenient. *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013). The question is "whether defendants have made a clear showing of facts which establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Bos. Telecommunications Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009)

---

[2] Barrett has requested that the Court take judicial notice of the Complaint and Answer in the California state proceedings against Oracle. Dkt. #9. Because these are public documents, that request is granted.

(quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir.2002)). However, *forum non conveniens* is an "exceptional tool to be employed sparingly." *Id*. (quoting *Dole*, 303 F.3d at 1118).

To determine if the doctrine applies, courts must balance public interest factors with the parties' private interests. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 237 (1981). The public interest factors include: "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum." *Boston Telecommunications Group, Inc. v. Wood*, 588 F.3d 1201, 1211 (9th Cir. 2009) (quoting *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1181 (9th Cir. 2006)). The private interest factors are: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Id*. at 1206-07. "The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

When a valid forum selection clause mandates venue in a non-federal forum, a motion to dismiss for *forum non conveniens* is the appropriate way to enforce the clause. *Atlantic Marine*, 571 U.S. at 60. A forum selection clause also modifies the *forum non conveniens* analysis by allowing the court to disregard the plaintiff's choice of forum and instead place the burden on the plaintiff to show that the forum selection clause does not apply. *Id*. at 63. The existence of a valid forum selection clause also does away with the private interest factors, leaving only the

public interest factors as an additional consideration. *Id*. at 64. "The 'practical result' is that forum-selection clauses will almost always control." *Boling v. Prospect Funding Holdings, LLC*, No. 18-5599, 2019 WL 1858506, at *5 (6th Cir. Apr. 25, 2019) (quoting *Atlantic Marine*, 571 U.S. at 64).

**2.    The Forum Selection Clause**

Federal law applies to the interpretation and enforcement of forum selection clauses. *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205 (9th Cir. 2011); *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988).[3] "[T]he common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it." *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009) (quoting *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987)). A written contract should be read as a whole and each part should be interpreted with reference to the whole. *Id*. (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999))

*a.    Whether Key is Bound by the Forum Selection Clause*

Barrett argues that the PPA and Schedule, which govern the relationship between Key and Barrett, incorporate the forum selection clause from the CSA. Barrett also contends that the CSA, Order, PPA, and Schedule were all executed as part of one transaction, making the forum selection clause in the CSA enforceable against all parties to that transaction. Key responds that, as a non-signatory to the CSA, the forum selection clause cannot be enforced against it. Key also

---

[3] Barrett makes several arguments based on California law—specifically, Cal. Civ. Code § 1642. Because federal law governs the interpretation of forum selection clauses, these arguments will receive less weight.

argues that the PPA and Schedule constitute a separate contract that does not incorporate the forum selection clause in the CSA.

The Ninth Circuit has stated that "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 n. 5 (9th Cir. 1988). In *Manetti-Farrow*, the non-signatory defendants' alleged actions "relate[d] in some way to rights and duties enumerated in the exclusive dealership contract" with the signatory defendant. *Id*. at 510-11, 514. The court accordingly held that "the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants." *Id*. at 514 n. 5. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.* came to a similar conclusion where the signatory and non-signatory defendants were related entities providing related services. 485 F.3d 450, 454 (9th Cir. 2007). The court held that the clause was enforceable against the non-signatory defendants because their services "arose out of and [were] intimately related to" the plaintiff's contractual relationship with the signatory defendant. *Id*. at 456 n. 2.

To determine whether non-parties should be bound, some courts have applied a "common sense, totality of the circumstances approach that essentially inquires into whether, in light of those circumstances, it is fair and reasonable to bind a non-party to the forum selection clause." *Oregon-Idaho Utilities, Inc. v. Skitter Cable TV, Inc.*, No. 1:16-CV-00228-EJL, 2017 WL 3446290, at *9 (D. Idaho Aug. 10, 2017). In keeping with this approach, courts have been more likely to bind a subsidiary of a parent company when only the latter agreed to a forum selection clause. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2014 WL 1047207, at *3 (N.D. Cal. Mar. 13, 2014). Courts also consider whether the non-signatory party was involved in executing the contract with the forum selection clause and therefore on notice of its potential

application. *See Pestmaster Franchise Network, Inc. v. Mata*, No. 16-CV-07268-EMC, 2017 WL 1956927, at *5 (N.D. Cal. May 11, 2017).

      Here, the alleged conduct underlying the payment dispute between Barrett and Key is integrally related to Barrett's contractual relationship with Oracle, making it fair and reasonable to bind Key to the forum selection clause. This is true whether one considers the facts surrounding the execution and performance of the PPA and Schedule or the law governing the relationship between those agreements and the CSA. Factually speaking, Oracle and OCC are closely related entities that facilitated Barrett's procurement of cloud services together. The CSA and PPA cross-reference each other and were executed on the same date, making it fair to assume that OCC was on notice of the forum selection clause. As an assignee standing in OCC's shoes, notice can be imputed to Key as well. *See Misic v. Bldg. Serv. Employees Health & Welfare Tr.*, 789 F.2d 1374, 1378 n. 4 (9th Cir. 1986). In addition, circumstances suggest that Barrett began missing payments to Key because of Oracle's alleged failure to deliver the services as promised. If this case continues, Barrett has stated that its defenses will all relate to Oracle's performance under the CSA and Order. *See* Dkt. #9 at 12. Even Key refers to the "Cloud Agreement" with Oracle when describing Barrett's alleged default on its obligations to Key. Dkt. #1 at ¶ 12-13.

      This is not surprising because, legally speaking, it is very difficult to view Barrett's agreement with OCC/Key as a completely independent contract. The PPA itself states that it is an agreement "for payment of Customer's acquisition of the System." Dkt. #1-2 at 2. Because the HCM system was provided by Oracle and not OCC there is no way it could be consideration for a contract solely between Barrett and OCC. There is also no indication in the PPA that OCC agreed to pay Oracle up front itself or extend a loan to Barrett to finance the cloud services.

Instead, this clever arrangement seems designed to subdivide the payment and performance aspects of Oracle's agreement with Barrett into different contracts, thus ensuring payment even if Oracle fails to deliver the promised services. The result is a disturbingly imbalanced transaction that preserves OCC's ability to terminate Barrett's rights to the cloud services if it fails to pay but denies Barrett the same opportunity to avoid payment if Oracle breaches. Unfortunately for Oracle, such an arrangement would likely be illusory or lacking in consideration. *See* 1 WILLISTON ON CONTRACTS § 4:27 (4th ed.) (contracts are illusory where one party can decide for themselves the nature and extent of performance).

To constitute a free-standing contract, Barrett's agreement with OCC seemingly would have to derive its consideration from altering Barrett's obligations under the CSA somehow—in other words, it would have to be a novation or accord. *See* Cal. Civ. Code § 1531(3) (a novation can be made "[b]y the substitution of a new creditor in place of the old one, with intent to transfer the rights of the latter to the former"). However, there are multiple problems with this theory. First, a substituted contract extinguishes an *existing* obligation. S*ee Xerox Corp. v. Far W. Graphics, Inc.*, No. C-03-4059-JF(PVT), 2005 WL 1629815, at *2-3 (N.D. Cal. July 8, 2005). But in this case the Order itself states that its payment terms would be "replace[d]" if Barrett executed a contract with OCC on the same day as its contract with Oracle, meaning no obligation yet existed when the PPA was formed. Dkt. #1-2 at 8. Second, it is unclear whether merely adding OCC as a new creditor is sufficient consideration for a separate contract that can be enforced by Key against the Barrett. *See* 30 WILLISTON ON CONTRACTS § 76:29 (4th ed.) ("It is difficult to find any legal detriment moving from [the new creditor] to [the debtor]."); *see also Westinghouse Credit Corp. v. Hall*, 144 B.R. 568, 575 (S.D. Ga. 1992) (holding that delayed payment alone is insufficient consideration for a novation).

One could also view Barrett's agreement with OCC as memorializing Oracle's assignment of rights to OCC. But this too creates problems for Key. California Civil Code § 1804.2 provides, "An assignee of the seller's rights is subject to all equities and defenses of the buyer against the seller arising out of the sale, notwithstanding an agreement to the contrary[.]" *See also Commercial Credit Corp. v. Orange Cty. Mach. Works*, 34 Cal. 2d 766, 771, 214 P.2d 819 (1950). If OCC's right to payment was assigned by Oracle, the language in the PPA waiving "any set-off, recoupment, claim or defense" related to the agreement with Oracle would be barred by statute. *See* Dkt. #1-2 at 2.

In short, the Court finds it very dubious that Barrett's agreement with Key is, in fact, a separate and independent contract. An agreement's own declaration of independence has no effect when enforcing it would violate basic principles of contract law. Therefore, as OCC's assignee, Key is bound by the forum selection clause in the CSA.

b. *Interpretation of the Forum Selection Clause*

Barrett argues that the forum selection clause is both broad enough to encompass the current dispute and mandatory in nature, meaning the parties *must* litigate in the designated forum. In response, Key again relies on the broad waiver language in the PPA and contends that its claims against Barrett are outside the scope of the forum selection clause because they are unrelated to Barrett's obligations to Oracle.

With respect to scope, "forum-selection clauses covering disputes 'arising out of' a particular agreement apply only to disputes 'relating to the interpretation and performance of the contract itself.'" *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) (quoting *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922 (9th Cir. 2011)). "By contrast, forum-selection clauses covering disputes 'relating to' a particular agreement apply to

any disputes that reference the agreement or have some 'logical or causal connection' to the agreement. *Id*. (quoting *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997)). "The dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract." *Id*.

Forum selection clauses may be either permissive or mandatory, but only the latter category will be enforced. *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 764 (9th Cir. 1989). The parties must clearly express their intent to make jurisdiction exclusive. *Id.* However, even if a forum selection clause is sufficiently mandatory, not all clauses lay venue in a specific court system—some require only that the parties litigate within a particular geographic area. The Ninth Circuit has drawn the following linguistic distinction: "a forum selection clause that specifies 'courts of' a state limits jurisdiction to state courts, but specification of 'courts in' a state includes both state and federal courts." *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1206 (9th Cir. 2011). Consequently, if the contract points to "courts in" a state or county, venue in state court is only mandated if there are no federal courts within the designated area. *See, e.g., Stone v. Cty. of Lassen*, No. 2:12-CV-01946-MCE, 2013 WL 269085, at *4 (E.D. Cal. Jan. 23, 2013). If such courts do exist, however, then the forum selection clause does not prevent the parties from litigating in either state or federal court. *See Simonoff*, 643 F.3d at 1206-07 (holding that the phrase "courts *in* King County" allowed for venue in either state or federal court) (emphasis in original).

Here, the forum selection clause encompasses Key's claim against Barrett and is mandatory in nature. For reasons already discussed, Key's claim under the PPA and Schedule is integrally linked to the CSA and Order—all of these agreements were executed together and are part of a single transaction. Although the PPA purports to be a separate contract, its true

independence will likely be a focus of this dispute going forward. Key's claim is therefore "related" to the CSA. *Id.* The clause is also mandatory. The clause states that that the parties agree to "exclusive" jurisdiction in San Francisco or Santa Clara counties, leaving little uncertainty that other locations are not permissible. Dkt. #1-1 at 7.

However, the forum selection clause does not require that litigation take place only in state court. The clause provides that "each party agrees to submit to the exclusive jurisdiction of, and venue in, the courts in San Francisco or Santa Clara counties in California in any dispute arising out of or related to this agreement." Dkt. #1-1 at ¶ 14. This language is basically indistinguishable from *Simonoff*, which means the clause allows for litigation in either the state or federal judicial system because there are U.S. district courts in both San Francisco and Santa Clara county. As a result, while the forum selection clause disfavors this forum, it also does not mandate venue in California state court.

**3.     *Forum Non Conveniens* Analysis**

Because the forum selection clause is enforceable against Key, Barrett argues that the Court must disregard the private interest factors and grant its Motion based on the public interest factors alone. Applying those factors, Barrett contends that California has an interest in the case because it hinges on Oracle's conduct in California and that both judicial systems would be burdened if two duplicative actions were allowed to continue. Key argues that private interests favor the current venue because Barrett's Vancouver, WA, headquarters means that witnesses and documents would be harder to access from a California court. Barrett also contends that the public interest factors support denying the Motion because the breach occurred in Washington and the case derives from a separate contract and is therefore not duplicative of the California litigation, to which Key is not a party.

Because the forum selection clause in this case points to a different state *or* federal forum, there is a question of how *Atlantic Marine*'s modified *forum non conveniens* analysis applies when the clause does not point exclusively to one judicial system. Several courts have applied *Atlantic Marine* when considering whether to transfer venue under § 1404(a) and the forum selection clause allowed for litigation in federal or state court. *See, e.g., Wood v. iGate Techs., Inc.*, 120 F. Supp. 3d 989, 991 (N.D. Cal. 2015) (declining to remand case and transferring it instead); *Bustos v. Dennis*, No. SA-17-CV-39-XR, 2017 WL 1049570, at *3 (W.D. Tex. Mar. 17, 2017). It does not appear that a court in the Ninth Circuit has addressed the current situation involving only a motion to dismiss for *forum non conveniens*.

After analyzing the rationale of *Atlantic Marine*, the Court concludes that the modified *forum non conveniens* analysis still applies as long as the forum selection clause does not designate the Western District of Washington as an acceptable venue. The Supreme Court's main goal in *Atlantic Marine* was to ensure that parties' "legitimate expectations" are given effect. 571 U.S. 49, 63 (2013). As long as the plaintiff defied those expectations by bringing suit in a forum that was not pre-selected, it makes sense to give no weight to their choice and give them the burden of showing why dismissal or transfer are not warranted. *See id*. Insofar as the private interest factors normally involve comparing the present forum with the selected one, their only application in a case like this would be to compare the selected federal and state forums. *See id*. at 64. Consequently, while the Court may consider convenience and other practical problems when deciding whether transfer under § 1404(a) would be a better remedy, the private interest factors do not bear on whether the case should remain in the present forum.

Under this approach, dismissal is the appropriate remedy here. The public interest factors favor dismissal because it would be a needless burden to allow this case to continue while the

California litigation is ongoing. Getting to the bottom of Barrett and Key's contractual relationship will inevitably involve considering the contract between Barrett and Oracle on which the California action is already focusing. Perhaps more importantly, there is a strong risk of inconsistent outcomes if the two actions are allowed to continue. Those inconsistencies could end up creating even more unnecessary litigation. It is thus eminently reasonable for the sake of both efficiency and accuracy to have one court work out the obligations between these parties.

California also has more of an interest in resolving the case. While Key may be correct that Barrett's alleged breach would have theoretically occurred in Washington, Oracle and OCC are located in California. Because Oracle does business with numerous entities from its home in California, the courts there have an interest in assessing the validity of this arrangement where Oracle supplies services but receives payment through a subsidiary that claims it must be paid regardless of whether Oracle performed. The fact that OCC assigned its interest to Key makes little difference since Oracle and OCC ultimately benefit one way or another.

Finally, the private interest factors suggest that dismissal is a better remedy than transfer. Whether it is in federal or state court, Key's claim against Barrett and Barrett's claims against Oracle belong in front of a single judge. This is the only convenient and practical conclusion. Because Barrett chose to file its case against Oracle in state court, it would be largely unhelpful to transfer this case to a federal court in San Francisco or Santa Clara county where the same problem would emerge again. But a federal court cannot transfer a case to state court, so the only viable option is dismissal. Key would be well-advised to intervene in the ongoing San Francisco Superior Court case by claiming an interest in the transaction. *See* Cal. Civ. Proc. Code § 387(d)(1)(B).

## CONCLUSION

For the above reasons, Barrett's Motion to Dismiss for *Forum Non Conveniens* [Dkt. #9] is GRANTED.

IT IS SO ORDERED.

Dated this 14th day of June, 2019.

*Ronald B. Leighton (signature)*

Ronald B. Leighton
United States District Judge